## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GRETCHEN M. SEXTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **C.A. 05-275 Erie** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying Gretchen M. Sexton's claim for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act"). The parties

have submitted cross-motions for summary judgment. For the reasons stated below, we deny the

plaintiff's motion and grant the defendant's motion.

## I. General Background

Ms. Sexton protectively applied for supplemental security income on March 4, 2003,

alleging disability based on mental impairments since March 3, 2003. Her application was

initially denied, and she requested a hearing. In her request for hearing she also alleged

disability based on migraine headaches. (R. at 42.) Ms. Sexton, represented by counsel,

appeared and testified at an administrative hearing before Administrative Law Judge ("ALJ")

Janet G. Harner on March 30, 2004. (R. at 217-255). A vocational expert, Samuel Edelman,

also testified at the hearing. On November 9, 2004, Ms. Sexton's counsel submitted additional

medical evidence to the ALJ. (R. at 211, 204-210.) The additional evidence was not considered

by the ALJ in making her decision. On December 16, 2004, the ALJ issued her decision denying

disability benefits and finding that Ms. Sexton was not disabled. (R. at 18-29.)

Ms. Sexton requested a review by the Appeals Council. The Appeals Council considered

the additional evidence submitted to the ALJ, but not reviewed by the ALJ, and denied Ms.

Sexton's request for review on July 22, 2005, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 7-10.) Ms. Sexton then filed this action seeking judicial review of the ALJ's decision.

Ms. Sexton was born on May 11, 1980, has a Ninth grade education, is single and has one child. She has no past relevant work experience.

## II. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34,38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant demonstrates that there is some 'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'" Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); *see also* 20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to be used when making this disability determination. See 20 C.F.R. § 404.1520. The United States Court of Appeals for the Third Circuit sets forth the five-step procedure as follows:

2

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . .   In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). . . .  In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. *See*, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

For mental impairments, an additional regulatory process supplements the

five- step process outlined above:

> [This process] require[s] the hearing officer (and ALJ) to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists. If an impairment is found, the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. If the mental impairment is considered "severe", the examiner must then determine if it meets a listed mental disorder. If the impairment is severe, but does not reach the level of a listed disorder, then the examiner must conduct a residual functional capacity assessment. At all adjudicative levels, a Psychiatric Review Treatment Form ("PRT form") must be completed. This form outlines the steps of the mental health evaluation in determining the degree of functional loss suffered by the claimant.

Knight v. Barnhart ,195 F.Supp.2d 569, 578-79 (D.Del. 2002).

The claimant carries the initial burden of demonstrating by medical evidence that he is

unable to return to his previous employment due to a medically determinable impairment.

Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this

burden, steps one through four described supra, the burden of proof shifts to the Commissioner

to show that the claimant can engage in alternative substantial gainful activity. Id.

3

## III. ALJ's Decision

The ALJ found that based on Ms. Sexton's non-exertional mental limitations and her age, education, and work experience, Ms. Sexton is not under a "disability." (R. at 28.) In particular, the ALJ found that Ms. Plaza retains the residual functional capacity to perform work at any exertional level, provided that the work is limited to performing simple, routine, repetitive tasks, which involve no reading or writing, and which can be learned by demonstration only; the work is low stress, defined as having no dealings with the general public and requiring no judgment or decision making; she is unable to work directly with others in common tasks; and she must also work in a stable environment, involving little, if any, change.

(R. at 28.)

The ALJ undertook the five-step sequential evaluation in determining that Ms. Sexton was not disabled. The ALJ made the following findings:

(1) that Ms. Sexton had not engaged in substantial gainful activity since the alleged onset of disability:

(2) that Ms. Sexton suffers from bipolar disorder, major depressive episode disorder, intermittent explosive disorder, and borderline personality disorder, impairments which are severe;

(3) her mental impairments, although severe, do not meet or equal the criteria of the Listing of Impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4;

(4) she retains the residual functional capacity for work with the above-recited limitations; and

(5) Ms. Sexton was able to perform work which exists in significant numbers in the national economy at the light exertional level, such as a stock clerk, office cleaner, and as a hotel/motel cleaner.

The ALJ also found that Ms. Sexton's allegations regarding her limitations are not totally credible. (R. at 28.) The ALJ explained that Ms. Sexton's allegations of the severity of her limitations due to her mental impairments are not supported by the record evidence that shows that the complaints were not always supported by clinical mental status examination findings; a pattern of non-compliance with medical treatment and failure to follow medical advice; a demonstrated ability to behave in socially appropriate ways when she wants to; and an ability to engage in a full range of activities. (R. at 25-26.)

4

With regard to Ms. Sexton's migraine headaches, the ALJ noted that there was sparse medical evidence in the record. While there was some medical evidence indicating infrequent complaints of headaches resulting in a prescription of Imitrix as needed, the ALJ found that there was no objective medical evidence to support Ms. Sexton's complaints of headaches occurring three times a week, lasting two to four hours each, and which significantly limits her functionality. (R. at 20.) Therefore the ALJ found that Ms. Sexton's headaches are a non-severe impairment. (R. at 20.) Ms. Sexton does not contest this finding, and thus we concern ourselves only with her mental impairments.

## IV. Analysis

Ms. Sexton argues that the ALJ's decision is not supported by substantial evidence. She argues that the ALJ failed to give adequate weight to her treating physicians' medical evidence, and failed to cite to record medical evidence to support her decision to disregard her treating physician's medical evidence. She specifically points to her two treating physicians' consistent global assessment rating of 50. In addition, she argues that the ALJ ignored or distorted her testimony regarding her limitations and activities of daily living, which are sporadic and transitory and do not show an ability to engage in substantial gainful activity. (Plaintiff's Brief, at 18.) Finally, Ms. Sexton argues that the ALJ erred in failing to adequately account for all of her impairments in determining her residual functional capacity.

## A. Medical Evidence Submitted After the Hearing

As an initial matter we must address the handling of Ms. Sexton's additional medical evidence submitted to the ALJ on November 9, 2004, consisting of medical records and a residual functional capacity assessment from Ms. Sexton's treating physician, Frank Yohe, M.D. (R. at 204-210.) Ms. Sexton complains in her brief that the ALJ provided no reason for disregarding her post-hearing medical evidence. (Plaintiff's Brief, at 12, 21.) She also submits that the ALJ erred in not recontacting Dr. Yohe pursuant to 20 C.F.R. §416.912(e)(1), in response to the new records. (R. at 23.)

5

The Social Security Regulations contemplate that additional evidence may be submitted after the close of an ALJ hearing. Ms. Sexton is correct when she states that the ALJ could have responded to the submission of the medical records in several ways. She could have considered the medical evidence and explained her reasons for rejecting or accepting the evidence. She could have considered the medical evidence, reopened the hearing, and recalled the vocational expert. Implicit in this argument is the assumption that the late-submitted medical records were actually part of the record before the ALJ.

In contrast, the Commissioner concludes that the medical records were not before the ALJ because Ms. Sexton submitted them after the administrative record was closed by the ALJ. (Commissioner's Brief, at 6.) According to the Commissioner, the ALJ closed the administrative record as of April 16, 2004, and Ms. Sexton's counsel did not submit the additional records until November 9, 2004. (R. at 254.) However, a review of the relevant portion of the hearing shows that the ALJ and counsel were specifically discussing counsel's efforts at obtaining medical evidence from Ms. Sexton's family doctor, Dean Spencer, M.D., regarding treatment of her headaches. (R. at 253-254.) The ALJ told counsel that based on the evidence before her she saw no support for making any finding with regard to Ms. Sexton's headaches. (R. at 253.) Because of this preliminary indication of how the ALJ would rule on this issue, Ms. Sexton's counsel requested more time to obtain relevant records from *Dr. Spencer*. (R. at 254.) The medical records at issue, submitted on November 9, 2004, were not discussed at the hearing.

In any event, the parties disagree about the meaning of the absence of a discussion of the relevant records from the ALJ's opinion. Ms. Sexton assumes that the ALJ actually considered the records but failed to discuss them. The Commissioner assumes that the ALJ did not consider the records. As noted, the ALJ's decision was issued on December 16, 2004, and counsel's letter submitting the additional medical records is dated November 9, 2004, so the ALJ certainly could have made the records part of the record evidence before issuing her decision, if she were aware of them.

6

We doubt that the ALJ was even aware of the records before the decision was issued. If the ALJ had received the records but declined to make them part of the record, we expect that she would have explicitly stated so in her decision. We also note that Ms. Sexton's counsel was surely aware that by submitting the records seven months after the hearing closed that the ALJ might issue her decision before receiving the records, or before reviewing the records. In light of the fact that there is no evidence that the ALJ did consider the late-submitted medical records before arriving at her decision we conclude that the records were not part of the evidence before the ALJ. The Commissioner is correct in stating that evidence considered by the Appeals Council, but not the ALJ, can only be reviewed by this Court to determine whether a remand for consideration of the new evidence is appropriate. Thus, the medical records submitted by counsel on November 9, 2004, first reviewed by the Appeals Council, cannot be considered by this Court in our assessment of whether substantial evidence supports the ALJ's decision. Matthews v. Apfel, 239 F.3d 589, 593-595 (3d Cir. 2001).

## B. Relevant Medical Evidence

As noted above, we confine our review to medical evidence concerning Ms. Sexton's mental impairments.

### 1. Psychological Evaluation from Crawford Country School District

When Ms. Sexton was nearly 14 years old she was referred for a psychological evaluation due to parental concern regarding a possible learning disability. (R. at 154-156.) An examination was conducted on February 18, 1994, by Psychologist Patti Davison of the Instructional Support Center of the Crawford Central School District. (R. at 154-156.) Dr. Davison noted areas of significant weakness were present in visual memory, verbal and visual sequencing, spatial abilities, visual-perceptual skills, visual-motor coordination, auditory processing, reading comprehension, and spelling (R. at 155.) In addition, it was noted that Ms. Sexton "displays an inability to interpret and organize visually perceived material and much difficulty with seeing how parts relate to a whole, seeing the logical sequence of things, and with planning and organizing skills." (R. at 155.) Dr. Davison found that Ms. Sexton was

7

experiencing a number of learning problems that required additional assistance. (R. at 155.) Dr. Davison suggested eight specific recommendations and also recommended the use of Learning Support. (R. at 155-156.)

A year and a half later, on June 1, 1995, a Comprehensive Evaluation Report was issued as a reevaluation of Ms. Sexton's current special educational program consisting of Learning Support. (R. at 157-159.) The report indicates that Ms. Sexton "has been successful in regular class without Learning Support assistance of any kind." (R. at 158.) Thus, the report concluded that Ms. Sexton was not eligible for special education services, and recommended phasing out the Learning Support. (R. at 158.) The report was signed by Ms. Sexton's guidance counselor, her Learning Support Teacher, and Dr. Davison. (R. at 159.)

## 2. Treatment at Meadville Medical Center

At age seventeen Ms. Sexton appeared at the Meadville Medical Center Emergency Department on the evening of September 22, 1997, complaining that her mind was going a thousand directions at once and that she felt like she wanted to break everything in the house. (R. at 99.) She was admitted to the hospital on September 23, 1997, because of "fleeting suicidal thoughts with no intent and depression." (R. at 100, 97.)

Medical records from her admission indicate that Ms. Sexton denies ongoing depressive symptoms although she does note mood swings; she has occasional suicidal ideation but has never hurt herself; and she has a long history of conduct disturbance. (R. at 95.) In addition, the records indicate the following information:

> She lived with her mother for years. Mother and father have been separated for a long time. However, within the past year she and her mother could not get along. She states that they were always arguing. She then went to live with the father. When questioned what the specific problems were, she was very vague and refused to answer. Much of her history is very vague and she seems to have some verbal difficulty expressing herself. She lived with her father for four months. She attended two sessions of outpatient psychotherapy with the therapist and then refused to go back. Now she has lived with her aunt and uncle for three weeks. She quit the 10th grade at Meadville Senior High School. Then she enrolled in Cochranton but now is planning to quit again. She does not think that she is able to learn. . . .
> She is angry and oppositional. She has no insight into her behavior difficulties. . . . .

8

(R. at 95). She was evaluated by psychiatrist Frank J. Yohe, M.D., who gave her a diagnosis of Oppositional defiant disorder. (R. at 96.) He also noted that she had severe stressors, and her global assessment functioning level was 50. (R. at 96.) Dr. Yohe also noted that Ms. Sexton had signed a 72-hour notice to leave Against Medical Advice shortly after being admitted. (R. at 96, 93.)

Dr. Yohe assessed Ms. Sexton's global assessment functioning at 55 upon discharge on September 25, 1997, but otherwise left his diagnosis the same. (R. at 92.) His treatment notes on discharge indicate that Ms. Sexton "exhibits no psychotic symptoms at the present time and no symptoms of bipolar disorder or schizophrenia [and] she exhibited no depressive behavior on the unit." (R. at 93.) Upon discharge she was given an outpatient appointment for therapy with Dr. Chiarello for October 2, 1997, and no medications were prescribed. (R. at 93, 94, 98. 100) Dr. Yohe stated that "prognosis is poor as she really did not follow through very long with outpatient therapy in the past." (R. at 93.)

Ms. Sexton did not receive mental health treatment again until November 26, 2000. Medical records indicate that Ms. Sexton was treated with the University of Pittsburgh Medical Center's Behavioral Health clinic on and off from November 26, 2000 through November 14, 2004. During different time periods she was seen by three psychiatrists: Tariq Qureshi, M.D., William Goodpastor, M.D., and Frank J. Yohe, M.D.

### 3. Treatment with Psychiatrist Tariq Qureshi, M.D.

Psychiatrist Tariq Qureshi, M.D. conducted a psychiatric evaluation of Ms. Sexton on November 26, 2000, after she appeared at Bethesda Community Care in Meadville, Pennsylvania complaining of irritability, mood swings, temper outbursts, getting into frequent physical fights, and depression. (R. at 151-153.) At the time she was twenty years old and had an eight-month old son. Dr. Qureshi stated her difficulties as reported by her, in part, as follows:

> She states for a long period of time she has been in physical fights with her mother and her current boyfriend. She states her boyfriend works 3rd shift and is unable to care for th[ei]r baby. She is overwhelmed. She states her mother

9

does not offer her much assistance to her either. She gets irritable easily. She states that she has been suffering from these kinds of mood swings since she was 16 years old. . . . She denies any suicidal ideation. . . . . She has a history of assaulting her boyfriend, however, he defends himself and does not fight back.

(R. at 151.) She also reported that she could "not hold employment because of her history of

lashing out in anger." (R. at 152.) Upon examination Dr. Qureshi reported Ms. Sexton's mental

status as follows:

. . . Her general hygiene and grooming is good. She is cooperative. During the interview her eye contact is fair. Her mood is irritable, hyperactivity is above average, she has a pattern of unstable and intense interpersonal relationship characterized by extremes of [idealization] and devaluation She also has a history of impulsive behavior; like substance abuse. She also has a history of inappropriate, intense anger or difficulty controlling anger and constant displays of temper outbursts and recurrent physical fights. She denies any obsession, compulsions [or] phobia. She denies any suicidal or homicidal thoughts. She denies any active psychotic symptoms. Insight and judgement are limited.

(R. at 152.) Dr. Qureshi's diagnosis was Bipolar Disorder, not otherwise specified, Intermittent

Explosive Disorder, not otherwise specified, and Borderline personality disorder, probably

primary diagnosis. (R. at 152-153.) He also noted an inadequate support system and assigned

her a global assessment functioning level of 55. (R. at 153.) At the time his treatment plan was

to start her on 250 milligrams of Depakote per day for a week. (R. at 153.) She was to return to

Dr. Qureshi's office in two weeks for an assessment following lab work up for liver function

tests and Depakote levels. (R. at 153.)

Ms. Sexton did not follow up with Dr. Qureshi following the November 26, 2000 visit as

medical records indicate that her next evaluation occurred with Dr. Qureshi nearly a year later on

September 19, 2001, as the result of a referral from her case worker. (R. at 102-104.) Dr.

Qureshi noted that he had already done a complete psychiatric evaluation on November 26,

2000, and that he prescribed Depakote but that Ms. Sexton never followed up. (R. at 102.) Dr.

Qureshi's mental status evaluation at this time states in part as follows:

. . . Her mood is anxious. Her speech is pressured. Her psychomotor activity was above average. She has a long history of unstable and intense interpersonal relationships characterized by alternating between extreme idealization and devaluation. She has a history of impulsivity in sex and binge eating. She has a history of recurrent suicidal behaviors and gestures. She also complains of chronic feelings of emptiness and affective instability. There is also a definite

10

> history of inappropriate intense anger and difficulty controlling anger, frequent
> displays of temper outbursts, constant anger, and recurrent physical fights. There
> is also transient stress related paranoid ideations. She denies any suicidal or
> homicidal thoughts at this time. She denies any obsessions, compulsions, or
> phobias. She is oriented to time., place, and person. Recent and remote
> memories are good. Insight and judgement are limited.

(R. at 103.) Dr. Qureshi's diagnosis this time was Borderline personality disorder, not otherwise
specified. (R. at 104.) He also noted inadequate social support system, being an unwed mother,
and a chaotic upbringing, and assigned her a global assessment functioning level of 55. (R. at
104.) At the time his treatment plan was to start her on 500 milligrams of Depakote two times
per day at bedtime, with liver functions tests and Depakote levels to be conducted after a week.
(R. at 104.)

Ms. Sexton returned on October 29, 2001, stating that she had not taken the Depakote
explaining that her boyfriend had thrown out the prescription. (R. at 105.) Dr. Qureshi gave her
a new prescription, a new lab work slip, and advised Ms. Sexton to be compliant with the
treatment plan. (R. at 105.)

On November 15, 2001, she stated that she had lost the prescription. (R. at 105.) She
was given another new prescription and again was advised to be compliant. (R. at 105.)

**4. Treatment with Psychiatrist William Goodpastor, M.D.**

Ms. Sexton's next contact with UPMC Behavioral Health occurred on April 1, 2003. (R.
at 108.) She underwent an Initial Evaluation performed by Clinician Susan Williams, M.A.,
which was also signed by a psychiatrist, who appears to be William Goodpastor, M.D. (R. at
108-115.) Relevant symptoms noted by Ms. Williams include dysphoria, tearfulness,
hope/helplessness, fatigue/low energy, isolation (sometimes), poor concentration, low self-
esteem, memory problems, anger/acting out, paranoia (sometimes), and impulsivity. (R. at 114.)
The preliminary treatment plan included individual therapy every two weeks to assist Ms.
Sexton with increasing her coping skills, increasing her self-esteem, and decreasing her
depression. (R. at 115.) In addition, medication management was recommended for decreasing
depression. (R. at 115.)

11

Ms. Sexton's diagnosis was borderline personality disorder. (R. at 115.) It was also noted that she had no social support, and her global assessment functioning level was 55. (R. at 115.)

Ms. Williams also prepared a Treatment Plan dated April 14, 2003, which was also signed by Ms. Sexton and a psychiatrist, who appears to be Dr. Goodpastor. (R. at 116.)  The treatment plan identifies the areas to improve as anger management, depression, and stress management. (R. at 116.) The target date for attaining the goals of being able to discuss feelings with therapists and develop at least one coping skill to deal with mood disturbance was July 15, 2003. (R. at 116.) The medical records also indicate that Zoloft was ordered for Ms. Sexton on April 16, 2003. (R. at 106.)

Ms. Sexton did not return to see Dr. Goodpastor until June 20, 2003. (R. at 134-135, 150.) Dr. Goodpastor completed an undated psychiatric evaluation of Ms. Sexton, in which he diagnosed her with Recurrent Major Depressive Episode, Rule out Bipolar Disorder, not otherwise specified. (R. at 134-135.) It is clear that this evaluation occurred on or about June 20, 2003, as the information it contains is consistent with the medical record dated June 20, 2003. The June 20, 2003 treatment note indicates that Dr. Goodpastor is discontinuing the zoloft ordered on April 16, 2003, noting that none was taken and that zoloft was not covered by insurance, and he prescribed Wellbutrin. (R. at 150.) This is consistent with the medication noted on the undated psychiatric evaluation. (R. at 150 & 135.)

Dr. Goodpastor's June 20, 2003 mental status evaluation states as follows:

> Patient presents cooperative and generally agreeable to evaluation. Affect is restricted. No abnormal movements are noted. Thoughts are organized. She is fully oriented. She demonstrates a unnumericable speech rage. No speech impediment is noted.  Mood is depressed but fluctuates. I can not notify clear manic symptoms. Thought content is unremarkable. Sleep is reported to be excessive. Appetite is within normal limits. She denies any suicidal or homicidal ideation. Energy is poor.

(R. at 135.) Dr. Goodpastor prescribed Wellbutrin and rated her global assessment functioning level as approximately 50. (R. at 135.)

12

On July 18, 2003, Dr. Goodpastor noted that Ms. Sexton remained irritable and that she had received little benefit from Wellbutrin to date. (R. at 149.) He again assessed Ms. Sexton's global assessment functioning level at 50, and he added Depakote as a new medication. (R. at 149.)

On August 15, 2003, Ms. Sexton reported that she had stopped taking her Wellbutrin and Depakote because she thought she was pregnant (R. at 148.) She also reported that she was stressed over everything. (R. at 148.) Dr. Goodpastor's plan included restarting the medications. (R. at 148.)

At her September 29, 2003 visit, Ms. Sexton stated "I'm not taking the Depakote," because she thought it was responsible for pain in her stomach. (R. at 147.) She again reported that she had also stopped taking her Wellbutrin. (R. at 147.) Dr. Goodpastor again planned to restart Wellbutrin, and to [consider] a mood stabilizer. (R. at 147.)

On October 17, 2003, Ms. Sexton underwent an "updated" Initial Evaluation assessment conducted by Clinician Susan Williams, M.A. (R. at 137.) An Initial Evaluation form was prepared and the form was signed on November 12, 2003 by Ms. Williams and Dr. Goodpastor. (R. at 137-144.) Relevant symptoms noted by Ms. Williams include dysphoria, tearfulness, hope/helplessness, fatigue/low energy, sleep problems (too much), weight gain, nervousness, isolation, poor concentration, low self-esteem, memory problems, compulsions (cleaning), anger/acting out, and impulsivity. (R. at 143.) The preliminary treatment plan again included individual therapy every two weeks to assist Ms. Sexton with increasing her depression, anger management, and coping skills. (R. at 144.) In addition, medication management was recommended for her depression. (R. at 144.) Ms. Sexton's diagnosis was Mood Disorder, not otherwise specified. (R. at 144, 136.)

Ms. Williams also prepared a Treatment Plan dated November 12, 2003, which was also signed by Ms. Sexton and Dr. Goodpastor. (R. at 136.) Her global assessment functioning level was 50. (R. at 136.) The treatment plan identifies the areas to improve as depression, anger management, and self esteem. (R. at 136.) The target date for attaining the goals of being able

13

to discuss feelings with therapist and develop at least one coping skill to deal with anger management, depression and self esteem was February 28, 2004. (R. at 136.)

On December 16, 2003, Ms. Sexton complained of low energy, feeling weak, tonsilitis, poor attention skills and being unable to remember what she read. (R. at 146.) Dr. Goodpastor noted that Ms. Sexton had started taking Imtrex prescribed by her primary care physician, Dr. Spencer. (R. at 146.) Dr. Goodpastor gave his prognosis as guarded. (R. at 146.)

At her March 23, 2004 visit, Dr. Goodpastor noted that Ms. Sexton had been hospitalized with tonsilitis. (R. at 145.) She also stated that she did not believe Wellbutrin was helpful for her energy. (R. at 145.) She complained of difficulty with focusing and concentration, and that she needs to reread things. (R. at 145.) Under "Plan," Dr. Goodpastor wrote "mood fluctuations. Will attempt to address her longstanding att[ention] difficulties[,] since grade school." (R. at 145.) In addition to continuing with the Wellbutrin, Dr. Goodpastor started a trial of Metadate, which is a form of Ritalin designed for sustained delivery. (R. at 145.)

Ms. Sexton again saw Dr. Goodpastor on June 9, 2004, and July 14, 2004, but these records were submitted with the medical evidence of Dr. Yohe and thus they were not before the Administrative Law Judge. Nonetheless we include them here as we do consider them insofar as they support a remand for evaluation by the Administrative Law Judge.

On June 9, 2004, Dr. Goodpastor assigned a global assessment functioning level of 60, and his prognosis remained as guarded. (R. at 209.) He noted minimal progress towards goals, Wellbutrin was continued, Metadate was discontinued because it was not covered by insurance, and a trial of a new medication was prescribed. (R. at 209.)

On July 14, 2004, Dr. Goodpastor continued the Wellbutrin, and increased the new medication. (R. at 208.) He also ordered an MRI of Ms. Sexton's brain to rule out an aneurism. (R. at 208.)

Also submitted as part of these records was a Treatment Plan dated April 12, 2004, prepared by Clinician C. Householder, M.A., which was also signed by Ms. Sexton and Dr.

14

Goodpastor. (R. at 206.)   The treatment plan again identifies the areas to improve as
depression, anger management, and self esteem. (R. at 206.)

### 5. Treatment with Psychiatrist Frank Yohe, M.D.

Ms. Sexton's September 20, 2004 visit with Dr. Yohe indicates that she is a transfer
patient from Dr. Goodpastor. (R. at 207.) Dr. Yohe gave Ms. Sexton the same diagnosis as Dr.
Goodpastor, Recurrent Depression Disorder, Recurrent. (R. at 207.) She reported that the
Wellbutrin helps some, but that there was no change with the new medication. (R. at 207.) He
noted her headaches, gave her a global assessment functioning level of 50, a prognosis of fair,
and that progress towards goals was moderate. (R. at 207.)

Dr. Yohe also completed a Medical Source Statement of Ability to Do Work-Related
Activities (Mental) dated October 28, 2004. (R. at 204-205.) Dr. Yohe's opinion was that Ms.
Sexton's ability to understand, remember, and carry out instructions was affected by her
impairment. (R. at 204.) Specifically, he opined that she had moderate limitations in her ability
to understand and remember detailed instructions, and to carry out detailed instructions. (r. at
204.) He opined that she had slight limitations in the ability to make judgments on simple work-
related decisions. (R. at 204.)

Dr. Yohe also thought that Ms. Sexton's ability to respond appropriately to supervision,
co-workers, and work pressures in a work setting was affected by her impairment. (R. at 205.)
Specifically, he opined that she had moderate limitations in her ability to interact appropriately
with supervisors, her ability to respond appropriately to work pressures in a usual setting, and in
her ability to respond appropriately to changes in a routine work setting. (R. at 205.) He opined
that she had slight limitations in her ability to interact with the public and to interact
appropriately with co-workers. (R. at 205.)

### 6. Non-Treating State Agency Psychologist Raymond Dalton, Ph.D.

Raymond Dalton, Ph.D. completed a mental residual functional capacity form and a
Psychiatric Review Technique Form ("PRTF") both dated May 15, 2003. (R. at 117-119; R. at
120-133.) Dr. Dalton's opinion on the PRTF was that Ms. Sexton had moderate limitations in

15

her difficulties in maintaining social functioning and moderate limitations in her difficulties in maintaining concentration, persistence, or pace. (R. at 130.) On the mental residual functional capacity form, Dr. Dalton reported that Ms. Sexton was moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting then or exhibiting behavioral extremes, and the ability to respond appropriately to changes in the work setting. (R. at 117-118.) Dr. Dalton found Ms. Sexton to be not significantly limited in all other areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. at 117-118.)

## C. Discussion

Ms. Sexton argues that the ALJ's decision is not supported by substantial evidence. She argues that the ALJ failed to give adequate weight to her treating physician's medical evidence. (Plaintiff's Brief, at 21, 13-14, citing R. at 91-101, 102-106, 107-116, 134-150, 151-153, 154-161, 162-203, and 204-211.) She also argues that the ALJ failed to explain what record medical evidence she relied on to support her decision to disregard the medical evidence from Dr. Yohe and Dr. Goodpastor. (Plaintiff's Brief, at 12, 17-18, 20.) Ms. Sexton argues that both Dr. Yohe and Dr. Goodpastor consistently assigned a global assessment functioning level of 50 and that there is no medical evidence to indicate that it is not a current rating and there is no medical evidence from treating sources that contradicts Dr. Yohe's opinion. (Plaintiff's Brief, at 15-16.) In addition, she also argues that the ALJ ignored or distorted her testimony regarding her functional limitations and activities of daily living. (Plaintiff's Brief, at 18, citing R. at 242-244.) Finally, Ms. Sexton argues that the ALJ's residual functional capacity determination is inconsistent with the jobs provided by the vocational expert. (Plaintiff's Brief, at 19.)

We have already addressed Ms. Sexton's argument regarding the ALJ's failure to acknowledge the medical records submitted by counsel on November 9, 2004. Because these records were first reviewed by the Appeals Council, we do not consider them in our assessment

16

of whether substantial evidence supports the ALJ's decision. Matthews, 239 F.3d at 593-595. These medical records consist of a Treatment Plan dated April 14, 2004; treatment notes from Dr. Goodpastor dated June 9 and July 14, 2004; a treatment note from Dr. Yohe dated September 20, 2004; Dr. Yohe's Medical Source Statement dated October 28, 2004; and Current Medications Sheet dated from June 20, 2003 through July 14, 2004. (R. at 204-210.) Despite the wrangling over these medical records, Dr. Yohe's medical evidence consists of only the September 20, 2004 treatment note and his October 28, 2004 Medical Source Statement. There is nothing in these documents, or the other late-submitted evidence, that would warrant a remand. In addition, even if we considered these documents in our assessment of the evidence it would not affect our conclusion that the ALJ's decision is supported by substantial evidence.

Ms. Sexton's primary argument consists of generally alleging that the ALJ failed to give adequate weight to all of her treating physician's medical evidence, and that the ALJ erred in disregarding evidence from Dr. Goodpastor because she failed to explain what record medical evidence she relied on to support her decision to disregard this evidence. Ms. Sexton does not explain how her medical records support her argument. She specifically singles out only medical evidence records that show Dr. Goodpastor's consistent global assessment functioning level of 50 (and Dr. Yohe's more current assignment of a global assessment functioning level of 50 contained in the late-submitted evidence). (Plaintiff's Brief, at 15.) We disagree that the ALJ failed to give adequate weight to Ms. Sexton's treating sources or that she failed to explain her decision to disregard Dr. Goodpastor's global assessment functioning level of 50.

With regard to Dr. Goodpastor's medical records the ALJ reviewed each of these medical records in her decision. (R. at 22-24.) She discussed the April 2003 initial evaluation and treatment plan, r. at 22-23, the June 20, 2003 treatment note, r. at 23, the June 20, 2003 psychiatric evaluation, r. at 24 (noting that it was undated), the July, August, September, October and December 2003 treatment notes, r. at 23-24, and the March 23, 2004 treatment note, r. at 24.

She specifically discussed Dr. Goodpastor's assignment of a global assessment functioning level of 50 when she stated: "While he assigned her a GAF of 50, indicative of

17

serious symptoms, this assessment is clearly not in keeping with his clinical observations as just noted, and, as such, is given little weight." (R. at 24.) Contrary to Ms. Sexton's assertion, the ALJ did provide reasons to explain her decision to give "little weight" to Dr. Goodpastor's assignment of a GAF of 50, rather than "controlling weight."

Ms. Sexton does not address the actual reasons the ALJ provided, but instead argues that the ALJ did not cite to *other* medical evidence that contradicted Dr. Goodpastor's GAF. However, one of the factors the ALJ considers in determining the weight to be given to a treating physician is whether the diagnosis is supported by the source's findings. 20 C.F.R. § 404.1527(d). Here, the ALJ discussed at length the substance of Dr. Goodpastor's medical records, including an initial evaluation, an updated evaluation, and a psychiatric evaluation. The ALJ determined that a global assessment functioning level of 50 is not supported by the evidence contained in Dr. Goodpastor's medical records.

As noted, Ms. Sexton does not address the ALJ's discussion of the substance of these records to explain how the ALJ's decision is in error, and thus we need not go into detail. Briefly, Dr. Goodpastor's records show that examinations of Ms. Sexton consistently failed to show significant problems as reported by Ms. Sexton; Ms. Sexton repeatedly failed to follow-up as instructed, with large gaps of time between some appointments and explicit noncompliance with her medications; and her self-report of her activities, along with her general appearance, demeanor and affect as recorded by the examiners, shows that Ms. Sexton is able to get along with others when she wants to. We find no error by the ALJ in giving little weight to Dr. Goodpastor's assignment of a GAF level of 50 or of her assessment of his medical records.

In addition, the late-submitted evidence included Dr. Goodpastor's treatment notes from June and July 2004. (R. at 208-209.) Although the ALJ did not consider these records, we note that there is nothing in these records to contradict the ALJ's assessment of the evidence, and in fact, in June, 2004, Dr. Goodpastor assigned a GAF level of 60 to Ms. Sexton. (R. at 209.)

In addition to the extensive discussion of Dr. Goodpastor's medical records, the ALJ also discussed her other relevant medical evidence that also showed that Ms. Sexton had a pattern of

18

noncompliance with her medical treatment. The ALJ discussed Ms. Sexton's hospital admission at the Meadville Medical Center in September 1997, specifically noting that she immediately signed a 72-hour notice to leave against medical advice, and that her prognosis for attending follow-up treatment was poor. (R. at 20-21.) She also noted that Ms. Sexton was not prescribed any medication as none was deemed necessary. (R. at 21.) The ALJ noted that there is no record evidence that Ms. Sexton followed-up after her 1997 hospital admission. (R. at 21.)

She did not seek treatment again until three years later when she saw Dr. Qureshi for the first time. (R. at 21.) Again, there is no evidence that Ms. Sexton followed-up after the 2000 visit until she returned to Dr. Qureshi in September, 2001. (R. at 22.) This time she did return for follow-up but she was not compliant with her medication. (R. at 22.) The ALJ noted that when she returned on October 29, 2001, she stated that she had not taken the Depakote because her boyfriend threw the prescription away. (R. at 22.) Dr. Qureshi gave her a new prescription and advised her to be compliant, but when she returned on November 15, 2001, she still had not taken the Depakote claiming that she had lost the prescription. (R. at 22.) Dr. Qureshi again gave her a new prescription and advised her to be compliant, but Ms. Sexton never returned to Dr. Qureshi and did not seek any mental health treatment again until she saw Dr. Goodpastor in April, 2003. (R. at 22.)

The ALJ also discussed the record evidence regarding Ms. Sexton's learning disability. (R. at 20-21.) Initially, a learning support program was recommended, but one year later the same evaluators found that Ms. Sexton was not eligible for special education services since she had been successful in regular classes without learning support. (R. at 20-21.)

Ms. Sexton does not address the ALJ's discussion of the record evidence from the Meadville Medical Center, Dr. Qureshi, or her high school, other than generally citing to the medical records without discussion. We find no error by the ALJ in her treatment of this evidence.

Ms. Sexton also complains that the ALJ ignored or distorted pertinent parts of her testimony regarding her functional limitations and activities of daily living. (Plaintiff's Brief, at

19

18, citing R. at 242-244.) But again this argument is left as a generalization without any discussion of how the ALJ distorted or ignored her testimony, or even any discussion of the actual testimony itself. Our review of the testimony and the ALJ's discussion of the testimony reveals no errors.

The ALJ discussed Ms. Sexton's testimony that she goes out to bars with friends, lives independently with her son, is the primary caretaker of her son, she receives help with her son from her mother and grandmother, that she does a full range of activities at home, attended mandatory "volunteer" programs at her son's Head Start school, and walks to and attends GED classes, studies and does her assignments at home (although she finds it difficult). (R. at 25.)

The ALJ also referred to Ms. Sexton's testimony that she gets into verbal and physical altercations with nearly everyone she has contact with. (R. at 25.) In contrast, the ALJ noted that despite these repeated and frequent altercations, Ms. Sexton has never been arrested for any altercation, and that she did not report any altercations with her friends, her son, anyone at her son's school, at her GED classes, while working out, or with any of her treating doctors. (R. at 25-26.) We agree with the ALJ's conclusion that although Ms. Sexton "complains that she cannot work because of her inability to get along with others, the record clearly shows that she is capable of getting along with other[s] when she wants to, as, by her own admissions[] she is able to perform other tasks involving social contact in a responsible manner." (R. at 26 (emphasis omitted).)

Finally, the ALJ addressed Ms. Sexton's testimony regarding her limitations due to her mental impairments and found, as discussed above, that her complaints are not supported by the medical evidence examinations. (R. at 25-26.) In addition, the ALJ properly emphasizes that the medical evidence shows "a long and consistent pattern of noncompliance and failure to follow medical advice," that Ms. Sexton has not required hospitalizations since the single admission in 1997, and that her mental health care treatment as been by her own choice sporadic. (R. at 26.) We find no error with how the ALJ addressed Ms. Sexton's testimony.

20

Ultimately, the ALJ found that Ms. Sexton did have significant mental impairments that limited her ability to work, but that she did not have a disabling mental impairment. Specifically, the ALJ found that Ms. Sexton was limited to work (i) that did not require reading or writing; (ii) that consisted only of simple, routine, repetitive tasks that could be learned by demonstration only; (iii) that does not require working directly with others in common tasks; (iv) that is low stress, defined as work having no dealings with the general public and requiring no judgment or decision making; and (v) that is in a stable environment involving little, if any, change. (R. at 26.) The vocational expert found that there was work that Ms. Sexton could perform with these limitations existing in significant numbers. (R. at 27.)

Ms. Sexton argues that the ALJ's residual functional capacity determination is inconsistent with the jobs provided by the vocational expert in that the listed jobs would require a minimal amount of reading or writing. (R. at 25.) Again, there is no support given for this argument. We agree with the Commissioner that Ms. Sexton "has presented no evidence to contradict the testimony of the vocational expert, whose qualifications as a vocational expert Plaintiff's attorney did not question." (Commissioner's Brief, at 15.) Furthermore, as noted by the Commissioner, "Social Security regulations recognize that illiteracy may 'significantly limit an individual's vocational scope' . . . [but] they also recognize that the primary functions of unskilled work do not require literacy." (Commissioner's Brief, at 16, quoting 20 C.F.R. pt. 404, subpt. P, app. 2, §202.00(g).) The Court also notes that nowhere in the record does Ms. Sexton claim to be illiterate, and there is evidence that she can read as shown, at a minimum, by her work towards a GED.

The ALJ's residual functional capacity is in all respects consistent with the limitations found in the record, reported by the consulting examiner, and reported by Dr. Yohe in the late-submitted Medical Source Statement dated October 28, 2004. Thus, we find no error with the ALJ's residual functional capacity determination or with her finding that there are significant numbers of jobs that Ms. Sexton could perform.

21

Finally, as our discussion shows, the evidence that was reviewed only by the Appeals Council does not warrant remand for a consideration by the ALJ. The evidence is consistent with the evidence already before the ALJ and the ALJ's residual functional capacity is consistent with Dr. Yohe's report of Ms. Sexton's limitations. Dr. Yohe's assignment of a GAF of 50 has already been considered by the ALJ, and rejected, and in addition a GAF of 50 is inconsistent with the limitations set forth by Dr. Yohe. Moreover, Dr. Goodpastor assigned a GAF level of 60 in June, 2004. We conclude that such evidence is not relevant and probative, and thus is not "material," and would not lead to a reasonable probability that consideration of this evidence would have changed the ALJ's mind. Szubak v. Secretary of Health and Human Services, 745 F.2d 831, 833 (3d Cir. 1984).

**D. Substantial Evidence**

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d at 427. We find that the Commissioner's decision is based on substantial evidence.

**V. Conclusion**

For the foregoing reasons, we hold that the decision of the Commissioner that Ms. Sexton is not disabled is supported by substantial evidence. Accordingly, an appropriate order will be entered granting the Commissioner's motion for summary judgment and denying Ms. Sexton's motion for summary judgment.

An appropriate order will be entered.

March 28, 2007
Date

Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:   counsel of record

22